OPINION OF THE COURT
Alfred H. Kleiman, J.
Defendant Chi Keung Seto, along with eight codefendants, was indicted on December 27, 1990. They were charged with several counts of kidnapping in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree. Defendant Chi Keung Seto moved this court for an order dismissing the indictment on the grounds that the People did not answer ready for trial within the time period specified in CPL 30.30.
CPL 30.30 (1) (a) requires that the People be ready for trial within six months of the commencement of a criminal action accusing a defendant of a felony offense. In this case, six months or 181 days of delay must be chargeable to the People to grant the relief requested. A delay having been alleged in excess of the permissible statutory time period, the People have the burden of demonstrating that they were ready within 181 days. (See, People v Santos, 68 NY2d 859, 861 [1986]; People v Berkowitz, 50 NY2d 333, 349 [1980].)
The action commenced on November 19, 1990 when defendant and codefendants were arrested and a felony complaint filed against them. For purposes of calculating speedy trial, the time began to run from this date. (See, People v Stiles, 70 NY2d 765, 767 [1987]; People v Lomax, 50 NY2d 351, 355-356 [1980].)
When the case was called on March 8, 1991, the defendant, who was out on bail, failed to appear. A bench warrant was ordered. The People answered ready for trial on April 16, 1991 and following guilty pleas of five of the codefendants the case proceeded to trial against the remaining defendants on August 20, 1991 and March 9, 1992. Defendant remained at large until he was arrested pursuant to the warrant which was vacated upon his involuntary appearance in court on June 21, 1993. Defense counsel, in his affidavit in support of the motion, contended that the prosecution "failed to exercise due diligence in determining the whereabouts of the defendant from November 17, 1991 through January 1993.” The People contended that diligent efforts were made to secure the production of the defendant.
On May 18 and May 19, 1994, a hearing was held before *257 me, following which this court orally denied defendant’s motion finding that the People had met their burden of showing that the prosecution had exercised due diligence to locate the defendant prior to his arrest on the warrant. The following are the court’s findings of fact and conclusions of law.
FINDINGS OF FACT
Detectives Oscar Flowe and Reginald Britt testified for the People. Yuen Lan Seto, defendant’s sister, testified for the defense. I found them all to be credible witnesses.
The Central Warrant office received the warrant on March 20, 1991. Detective Oscar Flowe of the Queens Warrant Squad received the warrant on April 30, 1991. On May 7, 1991, Flowe checked the computer to make sure the warrant was still active. On May 28, 1991, he visited the address on the warrant which was 150-55 58th Road in Queens, which he believed to be defendant’s address. The current tenants at the address did not know defendant but believed that the last tenants were Asian. Flowe showed defendant’s photo to a neighbor but he did not recognize the defendant. The neighbor indicated that three months before he had heard of a raid for kidnapping at the address. The same day Flowe sent a letter to the arresting officer to see if he had any additional information and Flowe also did a postal check to see if any new address was available for the defendant. On August 7, 1991, Flowe called the phone number for a Lucy Laing that was listed on the arrest report. Defendant had called her at the time of the arrest. The detective interviewed Ms. Laing over the telephone. Ms. Laing stated that the defendant was a friend of hers but she did not know his whereabouts. She said that she had not seen him for approximately five months. Flowe had forgotten to get Lucy Laing’s address from her when they spoke on the telephone, so on August 9, 1991, Flowe called the Bronx Warrant Squad to check the code directory to ascertain Ms. Laing’s address. He was unable to obtain it. Then on September 4, 1991, Flowe sent a "security check”, a letter to the New York Telephone Company requesting an address for Ms. Laing’s phone number, and received no affirmative response.
Flowe also tried to call one of the complainants who claims that he was one of the people abducted by the defendant in this case. Flowe reached someone at the complainant’s telephone number, but was unable to communicate with him on *258 the telephone because of a language difference. On January 15, 1992, Flowe visited the complainant’s address on Rivington Street. Flowe was unable to find the complainant at the address and the super said he did not know the complainant and that the complainant did not live at that address. The case was then sent downtown, which essentially means that although open, the detective stopped investigating the case because he had exhausted all his leads.
Meanwhile, unrelated to the case at bar, Detective Reginald Britt, from the Manhattan South Detective Squad, was assigned to investigate a shooting in which a homicide and assault took place on or about November 15, 1991 in a restaurant. One of the alleged victims who was shot was subsequently identified as Chi Keung Seto, the defendant in this case. On November 16, 1991, Britt saw the defendant (hereinafter referred to as the victim of the assault) when he was admitted to St. Vincent’s Hospital in New York City. The victim was suffering severe injuries to his head and was in a coma, and his identity was then unknown and the police were unaware of the warrant out against him in this case.
On November 17, 1991, Britt learned from a Jimmy Han that the unconscious victim’s name was a Mr. Seto. Mr. Han was a waiter who worked at the restaurant where the homicide/ assault took place. The waiter told the detective that Mr. Seto had been in the restaurant prior to that incident. Britt also met Yuen Lan Seto, the victim’s sister, on November 17, 1991 after she had attempted to visit her brother. Yuen had received a phone call from a cousin saying that police had called to say that her brother was admitted to a hospital. The police guard, in front of the victim’s room, informed Britt of her identity. The police guard at the hospital told her to see Detective Britt. (Her cousin had been notified by the victim’s girlfriend. The girlfriend’s telephone number was in the victim’s bag when he was admitted to the hospital.) That day, Yuen went to the Midtown South Precinct where she met Detective Britt. She gave Britt the victim’s date of birth, her address and her telephone number. She said that the victim was from mainland China but that she did not know of his exact whereabouts prior to the homicide/assault incident. Yuen then went to the hospital. She had not seen her brother for at least a year prior to November 1991. Nor did she know if he had a legitimate job.
Ms. Yuen visited her brother every day at St. Vincent’s Hospital even though he was unconscious for a few months. *259 Britt told her if the victim’s condition improved or he was able to give information regarding what happened to him, either she or he should contact Britt. Britt was informed by the staff at St. Vincent’s Hospital that the victim had a 50/50 chance of surviving.
As soon as Britt got the name of the comatose victim, he put the name into a police computer to determine whether the person was known to the police department. This was part of general procedure to see if a victim is known to the police department and to identify him. However, while he received a NYSID number from that search, Britt did not run the NYSID number into the computer for further information since the defendant was an alleged victim and had no reason to believe he was a defendant in a pending unrelated case. Detective Britt was concerned about solving the homicide in that moment and not at that time concerned about the background of the victim. The victim was still unconscious at that point.
A second person who visited the comatose patient was Bonnie Lee. She gave Britt information about the victim’s family but she hadn’t seen the victim recently. Ms. Lee had been the victim’s girlfriend.
For a period of time a police guard remained at the victim’s hospital room door for the victim’s safety, and also because the police had not had an opportunity to talk to him about the incident in which he was shot.
In the beginning of January 1992, Britt inquired at St. Vincent’s Hospital as to the victim’s condition. He was informed that the victim was in basically the same condition. In the spring of 1992, social workers called the police department to inquire if there were any objections to moving the still comatose victim to Cedar Lane Rehabilitation and Health Center, in Connecticut. The police had no objections to this transfer because the victim was still unconscious and still not a suspect in the case at bar. The victim was transferred to the hospital in Connecticut on February 20, 1992 and was discharged in November 1992. (According to defense counsel’s affidavit, the defendant awoke from his coma in July or August 1992 after extensive rehabilitation, and went to live with his sister. In early 1993 he went to San Francisco, California.)
The police department was never notified that the defendant was released from the hospital in Connecticut.
*260 Defendant was subsequently arrested on the street in New York City by the police of the Fifth Precinct and returned on the warrant. The warrant was vacated on June 21, 1993 and defendant was remanded.
CONCLUSIONS OF LAW
The defense does not claim that any of the period from the date of arrest to the issuance of the warrant (109 days) is includable. Nor does he raise any issue as to the 53-day delay between the issuance of the warrant and the date the Warrant Squad received it. Were this issue raised, I would have found only 29 days excludable "as reasonable administrative delay inherent in processing of the warrant”. (People v Marrin, 187 AD2d 284, 286 [1st Dept 1992], lv denied 81 NY2d 843 [1993].) As to the remaining period from the issuance of the warrant to date of rearrest, to preclude time being charged against them under CPL 30.30 (4) (c), "prosecutorial diligence in locating the defendant and/or securing his presence must be shown in order to invoke the exclusion for periods when the defendant was 'absent’ or 'unavailable’ and a bench warrant for his apprehension was outstanding.” (People v Bolden, 81 NY2d 146, 155 [1993].)
CPL 30.30 (4) (c) as amended in 1984 excludes periods of delay "where the defendant is absent” which is defined as "whenever his location is unknown and he is attempting to avoid apprehension or prosecution, or his location cannot be determined by due diligence.” "In other words, short of clear indication that the defendant is knowingly seeking to avoid return to court — e.g., evidence of his use of an alias or his flight from the jurisdiction * * * the only way to determine a defendant’s 'absence’ is by conducting a duly diligent search for him.” (People v Delacruz, 189 AD2d 717, 718 [1st Dept 1993].)
"Due diligence” has been defined as "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.” (Black’s Law Dictionary 457 [6th ed 1990].) "[T]he test as to what constitutes due diligence seems to be based on a determination of whether law enforcement acted in a reasonable and expeditious manner to locate the defendant based on the information available to it or readily ascertain *261 able by it.” (People v Denton, NYLJ, Sept. 11, 1992, at 25, cols 1, 2 [Sup Ct, Kings County].) The People must demonstrate "that they made 'diligent and * * * reasonable efforts to obtain the presence of the defendant for trial’.” (People v Davis, 205 AD2d 697, 701 [2d Dept 1994] [emphasis added].)
But "the police are not obligated to search for a defendant indefinitely.” (People v Garrett, 171 AD2d 153, 155-156 [2d Dept], lv denied 79 NY2d 827 [1991].) Due diligence was demonstrated where the initial months after the defendant’s failure to appear, the police made visits to the defendant’s last known address, questioned relatives and thoroughly exhausted all leads as to the defendant’s whereabouts. (People v Marrin, supra, at 286; see also, People v Moore, 157 Misc 2d 818, 820 [Sup Ct, Bronx County 1993].)
The Warrant Squad followed up on all the known information that was provided by this defendant at the time of his arrest: who he had contacted at the time of arrest, the address he had given, the arresting officer, and attempted to contact the complaining witnesses in the case. For that matter defense counsel makes no claim that the prosecution did not exercise due diligence in seeking to locate defendant from March 8, 1991 to November 17, 1991.
The sole contested and novel issue raised was whether, once this defendant was the victim of a shooting, was in the hospital at times under police protection for his safety, and his name became known to the police investigating the homicide/ assault, and they having obtained his NYSID number, there was a failure of "due diligence”. This court rejected this argument. While it is true that had the police investigating the shooting run defendant’s NYSID number they would have discovered that he had an outstanding warrant, however, their failure to do so was not a "failure of due diligence”. At this stage of their investigation it was not reasonable for the police to have further investigated the victim’s background. It is not the normal course of police work to do a criminal investigation into the background of a victim where the victim is not interviewable and in a comatose condition. For that matter there was no reason for the police to treat this unknown Asian male, an alleged victim of an assault, as a suspect or a perpetrator or a possible defendant with an open warrant. Also, when the defendant recovered he went to California. This was further evidence of his avoidance of *262 apprehension. (See, People v Brazeau, 162 AD2d 979, 980 [4th Dept], lv denied 76 NY2d 891 [1990].)
Since the time the case was filed as pending further investigation on January 15, 1992, there was no additional information in the hands of the police seeking the defendant which would constitute leads to further investigation.
I find the People have met their burden of proving that they exhausted all reasonably known leads as to defendant’s whereabouts and thus exercised prosecutorial diligence in attempting to locate defendant. Therefore, except as noted above, all periods since the issuance of the warrant are excludable.
(This court has decided the issues of due diligence on a prereadiness status. Since it is academic, this court need not decide the issue of the effect on due diligence of the People’s trial readiness shortly after the bench warrant was ordered but before the return of the defendant. [See, People v Kendzia, 64 NY2d 331, 337 (1985).])
Accordingly, defendant’s motion was denied.