**EMPLOYERS MUTUAL CASUALTY COMPANY and Mutual Marine Office, Inc., As Attorney in Fact for Employers Mutual Casualty Company, Plaintiffs,**

v.

**KEY PHARMACEUTICALS, INC. and Schering–Plough Corporation, Defendants.**

No. 91 Civ. 1630 (LBS).

United States District Court, S.D. New York.

Dec. 19, 1994.

Dougherty, Ryan, Giuffra & Zambito (James E. Ryan, Robert J. Giuffra, of counsel), New York City, for plaintiffs.

Anderson Kill Olick & Oshinsky, P.C. (Avraham C. Moskowitz, Chaim B. Book, of counsel), New York City, for defendants.

## OPINION

SAND, District Judge.

This case arises out of negotiations for settlement of a products liability action brought on behalf of Michael Hyde in 1985 in Washington state. The defendants in the present case, Key Pharmaceuticals ("Key") and Schering–Plough Corp. ("Schering"), were defendants in the Washington action. Employers Mutual Casualty Company ("Employers"), one of the plaintiffs in the present case, served as one of Key and Schering's excess insurers and provided coverage for the period of time at issue in the Washington action. Defendants ultimately settled the Washington suit on March 7, 1991.

On March 11, 1991, the present plaintiffs filed this action seeking a declaratory judg-

ment that they are relieved from any obligation to contribute to the settlement. Plaintiffs' first, second, and fourth causes of action sound in tort, and essentially allege that the defendants exhibited both negligence and bad faith in failing to settle the Washington action for an amount below the level at which Employer's excess policy coverage would kick in. Plaintiffs' third cause of action alleges a breach of various provisions of the insurance contract between Employers and the defendants, all of which in some manner concern the way defendants should have dealt with plaintiffs in handling and defending the Washington action.

In an opinion dated January 16, 1992 (the "1992 opinion"),[1] the Court denied defendants' motion to dismiss this action on grounds of improper venue, forum non conveniens, and failure to state a claim upon which relief can be granted. We also denied both defendants' and plaintiffs' motions for summary judgment on the contract and tort claims, without prejudice to renewal at the close of discovery.

Discovery in this case is now complete, and the Court once again has before it cross-motions for summary judgment. Both parties move for summary judgment on plaintiffs' claim that defendants' breach of express and implied contractual duties under the Employers policy, as well as their failure to satisfy fiduciary duties owed plaintiffs, relieve plaintiffs of any obligation to indemnify defendants for any portion of the *Hyde* settlement. Defendants move for summary judgment on their counterclaim that plaintiffs breached the Employers policy by unjustifiably disclaiming coverage thereunder. For the reasons stated below, we grant defendants' motion for summary judgment on each of plaintiffs' causes of action, as well as defendants' motion for summary judgment on their counterclaim.

## BACKGROUND

In February 1985, a products liability suit was brought on behalf of Michael Hyde

1. *Employers Mutual Casualty Co., et al. v. Key Pharmaceuticals, Inc., et al.*, No. 91 Civ. 1630,    1992 WL 8712 (S.D.N.Y. Jan. 16, 1992).

against Key in King County Superior Court in Seattle, Washington. Hyde's complaint contained strict products liability and negligence claims that were based on the allegation that Hyde had suffered permanent brain damage after taking the drug Theo–Dur, an anhydrous theophylline product manufactured by Key and used to treat asthma.

Key is a Florida corporation, and until its acquisition by Schering in 1986, maintained its main offices in Miami, Florida. After its purchase, Key became a subsidiary of Schering, a New Jersey corporation with headquarters in Madison, New Jersey. In January 1988, Hyde amended his complaint to add Schering as a defendant, invoking the theory of successor liability.

From October 27, 1979 through October 27, 1980, the period during which Hyde's claims arose, Key maintained three different levels of insurance protection against the kind of products liability claims brought against it in the *Hyde* litigation. Canadian Universal Insurance Co. ("Canadian") served as Key's primary insurer, providing the first $2 million in primary and umbrella coverage. Excess Insurance Co. ("Excess") supplied a second layer of coverage, which had per occurrence and aggregate limits of $1 million in excess of Canadian's $2 million in coverage. And Employers, an Iowa corporation, provided the third layer of coverage, with per occurrence and aggregate limits of $2 million in excess of the $3 million provided by Canadian and Excess. The Employers policy was issued by plaintiff Mutual Marine Office, Inc. ("MMO"), a New York corporation that acts as the managing agent and attorney-in-fact for a pool of insurance companies to which Employers belonged during the period relevant to the *Hyde* lawsuit. *See* Affidavit of Felix Salgado, Jr., Vice President for Claims, MMO, ¶¶ 7–8 ("Salgado Aff."). The insurance policy identifies Employers as the insurer and provides that, by virtue of the policy, Key became a member of Employers, entitled to vote at company meetings and participate in the distribution of company dividends.

Shortly after being served in the *Hyde* lawsuit, Key put Employers and Excess on notice of the litigation through its insurance broker, Johnson and Higgins of Florida, Inc. ("J & H, Florida"), and tendered the defense of the suit to Canadian. Canadian agreed to defend Key, and retained Carol Moody of the Seattle law firm Karr, Tuttle & Campbell as lead counsel. On July 18, 1990, one of Hyde's attorneys, Daniel Sullivan, made the first overtures regarding a possible settlement of the case. The plaintiff's demand, Sullivan wrote, was for the "policy limits" of Key's insurance coverage, "to include any and all excess insurance available." Letter from Daniel Sullivan, Attorney for Michael Hyde, to Carol L. Moody, Attorney for Canadian on behalf of Schering/Key, July 18, 1990, at 1.

Sometime in the late fall of 1990, Key and Schering learned that Canadian was on the verge of insolvency and would probably be unable to contribute any portion of its policy limits to the satisfaction of Hyde's claims. The immediate practical consequence of Canadian's financial difficulties was that Key and Schering, in continuing coordination with Moody, assumed direct control of settlement negotiations and trial preparation, and direct responsibility for financing the cost of the litigation. The immediate conceptual quandary raised by Canadian's difficulties was: which party would bear the responsibility for paying the first $2 million in liability in the *Hyde* case?

On January 28, 1991, after several months of discussion (including two mediation sessions with Hyde's counsel), Key and Schering made a settlement offer having a present cash value of between $825,000 and $850,000. Hyde rejected the offer. Trial commenced on January 31, 1991. On March 4, 1991, approximately five weeks into trial, Key and Schering tendered the amount of what was essentially Key's self-insured exposure—$2 million.[2] Hyde rejected that offer, too, as well as a follow-up offer of $3 million. Final-

---

2. We say "essentially" because, at the time Key and Schering tendered the first $2 million in insurance coverage, Canadian was not technically insolvent. *See* Letter from Morgan M.W. Web- er, Senior Litigation Counsel for Schering, to Peter H. Downing, Assistant Vice President for Claims for Canadian, March 1, 1994.

ly, on March 7, 1991, Key and Schering settled the case with Hyde for $4.175 million. Key tendered the first $2 million, and Excess tendered its $1 million layer of excess coverage. Employers and MMO, however, refused to contribute any portion of Employer's layer of coverage to the settlement. They charged defendants with bad faith and negligence in failing to settle for an amount of $3 million or less, and they contended that defendants' misconduct relieved them of any contractual obligation to tender their layer of coverage.

Pared down to its essentials, the issues in this lawsuit are (1) whether plaintiffs are correct in believing that Key, their insured, owed them a duty to accept a settlement offer from Hyde below the level of plaintiffs' excess coverage, where a judgment of liability above that level was a possibility; and (2) whether defendants' handling of the *Hyde* litigation—in particular, their handling of settlement possibilities—amounted to breaches of various provisions of the Employers insurance policy.

## DISCUSSION

### I. Choice of Law

In the 1992 opinion, we reserved decision on the choice-of-law issues presented by

plaintiffs' claims because the record was not complete enough to allow us to resolve some factual disputes important to the choice-of-law calculus. The first order of business now is to revisit that question.

### A. Plaintiffs' Tort Claims [3]

■ As noted in the 1992 opinion, New York choice-of-law rules, which we are bound to apply, *see Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), require courts to apply the law of the state that has "the most significant contacts with the matter in dispute." *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99, 102 (1954) (quoting *Rubin v. Irving Trust Co.,* 305 N.Y. 288, 113 N.E.2d 424, 431 (1953)). In *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the New York Court of Appeals departed from the traditional conflicts rule in tort actions, which would automatically apply the law of the place of the wrong. Instead, the court held that "controlling effect" must be given "to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the

**3.** At several points in their papers, plaintiffs deny that they have brought causes of action sounding in tort. *See, e.g.,* Plaintiffs' Reply to Defendants' Memorandum in Opposition at 2 ("It is plaintiffs' position that this case arises out of breaches of duties owed by the defendants to the plaintiffs which were expressed or implied in the contract of insurance."). However, plaintiffs are not altogether consistent on this issue. *See, e.g.,* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Mem. in Opp.") at 7 (suggesting that plaintiffs' first, second, and fourth causes of action are not "really cause[s] of action sounding *solely* in tort") (emphasis added); Plaintiffs' Memorandum in Support of their Motion for Summary Judgment ("Pls.' Mem. in Support") at 28, 52 (speaking of Key and Schering's fiduciary obligations to plaintiffs).

We recognize that there can be a fine line between tort causes of action based on allegations of bad-faith conduct, and contract causes of action based on allegations of breach of implied duties of good faith and fair dealing. *See Twin City Fire Ins. Co. v. Country Mut. Ins. Co.,* 23 F.3d 1175, 1179–80 (7th Cir.1994) (noting that many courts have recast the implied contractual duty of good faith settlement as a tort duty). Nevertheless, as implied in our 1992 opinion, we

believe that plaintiffs' first, second, and fourth causes of action sound more in tort than in contract. Those causes of action allege that defendants, acting negligently and/or in bad faith, violated duties that they owed plaintiffs as a result of having stepped into Canadian's shoes and having assumed the role of the primary insurance carrier in the *Hyde* litigation. *See* Plaintiffs' Complaint ¶¶ 24, 25, 27. Nothing in the language of these three causes of action suggests that what plaintiffs mean by "duties" are implied contractual duties rather than common-law tort duties.

Moreover, the language of plaintiffs' *third* cause of action (the contract cause of action) lays the foundation for their claim of breach of implied contractual duties of good faith and fair dealing, and thus suggests that the other three causes of action sound in tort, not contract. *See* Plaintiffs' Complaint ¶ 26 ("In its involvement in the *Hyde* matter and its conduct relating thereto, the defendants breached its [sic] duties under the insurance contract between EMPLOYERS and the defendants, *including but not limited to,* breach of Paragraph 16 of the Insuring Agreement....") (emphasis added).

litigation." *Babcock,* 240 N.Y.S.2d at 749, 191 N.E.2d at 283. It was our judgment in 1992 that the principal tort-law issue raised in this litigation was whether an excess insurer might maintain a direct cause of action against an insured, once the primary insurer became insolvent. We further noted that the home states of the excess carrier and the insured, respectively, would have a substantial interest in regulating the remedial options available to excess insurers against their insureds.

Having reviewed all of the materials submitted by the parties on this issue, we find as follows:

New Jersey (the state favored by defendants) is the state in which the insured (Key) is now headquartered, and in which the insured's parent and co-defendant (Schering) is both headquartered and incorporated. Accordingly, New Jersey may well have an interest in protecting Key and Schering from the increased exposure to liability that would result from the availability of direct actions by excess insurers against their insureds.

New York (the state favored by plaintiffs) also has an interest in the allocation of loss between excess insurers and their insureds because MMO, a New York corporation, was effectively functioning as the excess insurer in this case.

In reaching this last conclusion (with which defendants disagree, claiming that Iowa-based Employers is the excess carrier here), we have looked closely at the nature of the insurance pooling system of which Employers was a member. The structure of that system is undoubtedly rather common: a number of insurance companies associate together for the purpose of underwriting a particular set of risks, with each member company sharing in the total premiums, losses, and expenses of the pool according to a predetermined participation percentage. Salgado Aff. ¶¶ 6–7. Each member of the pool, that is, shares, to differing degrees, in

each and every risk written by the other members of the pool. Deposition of Mark Blackman, President of MMO, at 9–11, 104 ("Blackman Dep.").[4]

What this means for choice-of-law analysis is that it is not at all clear, from the mere fact that Employers was listed as the insurer on the policy issued to defendants by MMO, that Employers functioned as the excess insurer in this case. As explained by Felix Salgado, any one of the pool members for the years 1979 and 1980 could have been named the insurer on Key's policy. Salgado Aff. ¶ 9. While Employers was in fact the company named, Employers' exposure under Key's policy would depend on its particular participation percentage in the insurance pool. That percentage could have been as low as 5%, or as high as 75%; the record does not say.

Moreover, even if Employers' participation percentage was as high as 75%, it is not at all clear that the funds Employers contributed to the pool would ever be used to satisfy 75% of Key and Schering's insurance claim. This is so because of the twin facts that (1) MMO followed the business practice of "paying old losses with new premium," Blackman Dep. at 94, 104, and (2) Employers left the pool in 1985. Salgado Aff. ¶ 10. It seems just as likely that the money for satisfaction of Key and Schering's claim would come out of funds contributed by Employers' replacement in the pool (a company by the name of Arkwright Mutual Insurance Company) as out of funds contributed by Employers. *See* Salgado Aff. ¶ 10.

■ If the insurance pool, as a whole and over time, is ultimately the real insurer of the risks underwritten by the pool, and the participating members are only placeholders for specific risks, the question remains as to which entity should be deemed the insurer of Key and Schering's liabilities for choice-of-law purposes. Since the answer could not possibly be "all the companies that partici-

---

4. For example, in a pool comprised of ten insurance companies, each with a ten percent participation percentage, each company would be liable for $100,000 on a claim for the limits of a $1 million policy. In a pool comprised of four insurance companies, with three companies hav-

ing a participation percentage of 30%, and the fourth company having a participation percentage of 10%, the loss distribution on the same claim would be 30%, 30%, 30%, and 10%, respectively.

pate in the pool" (since that would aggravate the choice-of-law question, rather than resolve it), the obvious candidate for excess insurer is MMO, the entity that manages the pool. As manager, MMO writes and issues the insurance policies, receives the premiums, defends and prosecutes legal actions, makes the determinations relevant to coverage matters, pays out claims, and shares, in a somewhat indirect sense, in the risk of loss on the pool's policies. Blackman Dep. at 93–96, 98, 106.[5] What's more, MMO apparently does all of these things without input from, or even knowledge on the part of, the member insurance companies. Blackman Dep. at 94, 106.

MMO's central role in operating the insurance pool to which Employers belonged strongly suggests that MMO, rather than Employers, would be the entity that would react to a ruling by this Court concerning the remedies available to excess insurers.[6] And this fact, in turn, suggests that New York (MMO's home state), rather than Iowa (Employer's home state), has the greater interest in looking out for the excess insurer's welfare in this case.

In light of the foregoing, the choice as to which state's law governs plaintiffs' tort claims comes down to New York and New Jersey, the states in which the excess-insurer-in-fact and the insured reside, respectively. We hold that New Jersey law applies. As plaintiffs concede, many of the decisions regarding defense representation, settlement negotiations, and settlement recommendations in the *Hyde* case were made by Schering's in-house litigation department in New Jersey. Pls.' Mem. in Support at 8. New Jersey accordingly represents the state where the alleged torts principally took place. Given that loss-allocation as well as conduct-regulating concerns both weigh in on the side of New Jersey, we think it clear that New Jersey has the greater concern with the

issues raised in this litigation. *See Bader By Bader v. Purdom,* 841 F.2d 38, 39 (2d Cir. 1988) (under New York law, "significant contacts" are almost exclusively the parties' domiciles and the locus of the tort); *Babcock,* 240 N.Y.S.2d at 750–52, 191 N.E.2d at 284–85. We therefore hold that New Jersey law governs plaintiffs' tort claims.

### B. *Plaintiffs' Contract Claims*

■ The parties agree that *Olin Corp. v. Insurance Co. of North America,* 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991), correctly states the factors that New York courts consider when deciding choice-of-law questions involving insurance contracts.

> In cases involving insurance contracts, New York courts have looked principally to the following factors: the location of the insured risk; the insured's place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business.

743 F.Supp. at 1049.

Defendants argue that application of the *Olin* factors to the facts of this case shows that Florida law should govern plaintiffs' breach of contract claims. The risk covered by the insurance policy was not confined to any particular location, say defendants, but encompassed all of Key's (presumably nation-wide) products liability. At the time Key purchased the Employers policy, Key was a Florida corporation with its principal place of business in Florida. Key purchased the policy from the Miami, Florida offices of its insurance broker, J & H, Florida, received the policy in Florida, and paid the premiums in Florida to J & H, Florida. Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Mem. in Support") at 28–29.

---

5. MMO receives a commission for managing the pool, which is based in part on net underwriting profits. Salgado Aff. ¶¶ 7, 9; Blackman Dep. at 11.

6. In the 1992 opinion, we noted that
   > [w]ithout a direct action against the primary insurer available, an excess insurer will have

to bear any increased costs that result from the primary insurer's bad faith. Excess insurers are likely to react to this increased risk by increasing insurance premiums, which may discourage the purchase of excess insurance. *Employers Mutual Casualty Co., et al.,* 1992 WL 8712, at *9.

Plaintiffs take the same set of transactions concerning the formation and performance of the Employers insurance contract and paint a different picture. The policy, they say, was issued and underwritten in New York by MMO, a New York corporation; it was negotiated with, and delivered to, Capacity Management International ("CMI"), an intermediate insurance broker in New York that had received the initial solicitation for an insurance policy from Johnson & Higgins of New York (the head office of Johnson & Higgins); and premiums on the policy were collected in New York by MMO. Therefore, say plaintiffs, New York law applies. Pls.' Mem. in Opp. at 4–5.

The problem with the parties' characterizations of the transactions relating to the insurance contract is that, while accurate as far as they go, both are incomplete. There was, in fact, a string of actors involved in the formation and performance of the Employers contract: MMO worked with the intermediate broker CMI, which worked with the broker J & H, Florida, which in turn worked with the insured, Key, in Florida. It is consequently difficult to say that the contract was "issued" and "delivered" solely in New York or Florida, or that the insurance broker operated solely in New York or Florida, or that the premiums were paid solely in New York or Florida.

For example, two brokers handled the solicitation and formation of the policy: CMI of New York, which negotiated the contract with MMO, Blackman Dep. at 53–54, 56, 58, 63–66, and J & H, Florida, which negotiated the same contract with CMI and worked with Key on the Florida end. *See* Blackman Dep. at 57–58. While Key may have sent its premiums to J & H, Florida, it is also true that MMO collected (or "was paid") the premiums on behalf of the insurance pool in New York. And while MMO can be said to have delivered the policy to CMI in New York, Blackman Dep. at 65–66, J & H, Florida can be said to have made final delivery of the policy to the insured, Key, in Florida.

Such are the ambiguities that arise from trying to segment a set of interrelated transactions into discrete, bite-sized parts and assigning each part a positive or negative va-

lence in the choice-of-law calculus. We do not think that *Olin,* or the New York law that *Olin* interpreted, compels such an approach. Rather, the task is always to determine where the center of gravity of an insurance policy lies. In this regard, we think it important that MMO, a New York corporation, was the excess-insurer-in-fact in this case, *see supra* pp. 662–63; that MMO negotiated the terms of the Employers policy with CMI, a New York broker; that the policy was written in such a way as to conform to the requirements of New York insurance law, *see* Excess Liabilities Umbrella Policy for Employers Mutual Casualty Company, section entitled "New York Amendatory Endorsement"; and that Key's principal place of business at the time it allegedly breached the policy provisions was in New Jersey, not Florida. Together, these aspects of the contract transaction convince us that this insurance contract was rooted more solidly in New York than in Florida (which, during the time of the disputes over the terms of the policy, had virtually no contacts with the policy). We accordingly hold that New York law governs plaintiffs' contract claims.

## II. The Law Applied

### A. *Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), to grant summary judgment the Court must be satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party has the burden of demonstrating the lack of any such issue. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In this case, the parties have cross-moved for summary judgment. Since we ultimately conclude that defendants' summary judgment motions prevail, we view defendants as the moving party for purposes of the analysis that follows, and accordingly resolve all factual ambiguities and draw all reasonable inferences against them. *Semetex Corp., et al. v. UBAF Arab American Bank,* 853 F.Supp. 759, 761 (S.D.N.Y.1994).

### B. *Plaintiffs' Tort Claims*

■ Plaintiffs base their argument in support of their motion for summary judgment on the undisputed proposition that an excess carrier has a cause of action against a primary carrier that acts in bad faith and fails to defend or settle a claim against the common insured in such a way as to spare the excess carrier's coverage layer. *See Estate of Penn v. Amalgamated General Agencies,* 148 N.J.Super. 419, 372 A.2d 1124, 1126 (Ct. App.Div.1977) (noting and endorsing the general rule that the excess carrier is subrogated to the insured's rights against the primary carrier).

But, as defendants point out, the present case does not concern the obligations running from a primary carrier to an excess carrier; it concerns the obligations running from a *policyholder* that is self-insured for its primary layer of coverage to its excess carrier. New Jersey courts have not yet addressed this particular legal relationship (although, as the citation to the *Penn* case indicates, they have decided that an excess carrier has a cause of action against a primary carrier). Indeed, it appears that only two courts in the country have squarely addressed the excess carrier-policyholder relationship, and they have both rejected the argument that a policyholder owes a common-law duty to its excess insurer to attempt to settle a lawsuit at a point below the threshold of the excess insurance. *Commercial Union Assurance Cos. v. Safeway Stores,* 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980); *International Ins. Co. v. Dresser Industries, Inc.,* 841 S.W.2d 437 (Tex.App.1992).

In order for us to say that New Jersey would impose on a policyholder the duty of protecting the interests of its excess carrier in defending lawsuits against it, we would have to say that New Jersey would see no relevant legal difference between a policyholder that "steps into the shoes" of its primary carrier, and the primary carrier itself. But we cannot say this. For one thing, New Jersey initially recognized a duty running from primary carrier to excess carrier in part because of the need to reinforce the fiduciary duty already running from primary carrier to insured. *See Estate of Penn,* 372 A.2d at 1126–27.[7] This need for reinforcement clearly does not exist in the absence of a tripartite relationship of insured-primary carrier-excess carrier, where the insured is self-insured for liabilities all the way up to the level of the excess carrier's coverage.

It is also clear that recognizing a tort cause of action by an excess carrier against its insured would substantially increase the duty and potential liability of the insured. As the *Dresser* court noted, the threat of such actions "would require an insured to settle any case, even one in which it believes liability is questionable or nonexistent, if there is any risk of a verdict impacting the excess layer of coverage." 841 S.W.2d at 444. Yet, in light of the fact that New Jersey has not yet even addressed whether a *primary carrier* owes a duty of care *directly* to the excess carrier (as opposed to owing a duty by virtue of "equitable subrogation"), we do not believe we can responsibly predict that New Jersey would impose a new burden, through a new duty of care, on a *policyholder.*

Finally, we are impressed enough with the differing circumstances of self-insured policyholders and primary carriers to hesitate to assume that New Jersey would create novel tort duties on behalf of excess insurance companies as against their policyholders.

7. The *Penn* court wrote that the fact that an excess insurer

> may recover from the primary for a breach of duty does not increase the duty or liability of the primary. Under the doctrine of equitable subrogation, the duty owed an excess insurer is identical to that owed to the insured.... In considering whether it will settle a claim, the primary insurer may consider its own interests, but it must equally consider the interests of the insured, which become the interests of the excess insurer by subrogation.

> ....

> [Moreover], if the primary carrier is relieved of its duty to accept reasonable offers by the existence of excess insurance, ... it would ... have the effect of reducing the incentive of a primary insurer to settle when the settlement offer is near or over its policy limits. This is contrary to the interests of the public and the insured in obtaining prompt and just settlement of claims.

The simple fact of the matter is that policyholders, even partially self-insured policyholders, are not primary carriers. Policyholders pay premiums to excess carriers in order to have protection against the risks of litigation (which risks include that of guessing wrong in settlement negotiations); primary carriers do not, and therefore must be careful as to how they balance their own interests with the competing interests of the excess carriers in any given claim instance. We have found no basis in the law, nor have we been pointed to any, for concluding that, apart from the premiums it pays, an insured also assumes a fiduciary duty of care toward its insurer in the context of settlements. Indeed, we have no idea what the basis for a fiduciary duty running from insured to insurer would be, independent of the terms of the contract of insurance itself.

Accordingly, we decline to recognize, under New Jersey law, a common-law duty giving rise to a cause of action by an excess insurer against its insured for failure to settle a lawsuit below the threshold of the excess policy. We therefore grant defendants' motion for summary judgment on plaintiffs' tort claims.[8]

### C. *Plaintiffs' Contract Claims*

Plaintiffs' contract claims, however, are another matter, for in the realm of contracts one party's duties to another are deemed to be self-imposed. Duties that the courts rightly hesitate to recognize as part of tort law are nonetheless properly enforced when the parties themselves have bargained for them.

Plaintiffs' contract claims rest on a theory of events that goes something like this:

1. During the pre-trial and mediation stages of the *Hyde* litigation, and during the initial trial stages, Hyde's counsel offered on "many" occasions to settle the case for roughly $3 million—an amount of money that would not have involved Employers' layer of coverage. Pls.' Mem. in

Support at 12. This settlement offer was reasonable given, among other things, the fact that one recent theophylline toxicity case tried in Washington state (the "*Fisons*" case) had settled for $6.9 million, while another theophylline case tried outside Washington state had resulted in a total damages award of $22.2 million.

2. Key and Schering themselves recognized early on in the *Hyde* litigation that the case carried the potential for a multimillion dollar verdict against Key which could exceed all of Key's insurance coverage. This assessment never changed, for when James Dundon, Schering's litigation counsel, requested authority to settle *Hyde* in January, 1991, he noted that there was a "real prospect for a verdict of over $5,000,-000 . . . ." Memorandum from James Dundon, Attorney for Schering, to Schering Distribution, January 21, 1991, at 2.

3. However, rather than follow the reasonable and prudent course of accepting Hyde's $3 million settlement offer, Key and Schering stonewalled out of self-interest. It had become apparent to them that the practical insolvency of Canadian left Key self-insured for the first $2 million loss on *Hyde*; and, not wanting to foot this bill, Key and Schering devoted their efforts to figuring out ways to maneuver Key's excess insurers into covering Key's primary insurance layer and fully funding the *Hyde* settlement. Key and Schering did this despite clear language in the Employers policy that Employers was not required to "drop down" and fund underlying coverage levels in the event of the insolvency of an underlying insurer.

4. Key and Schering's refusal to acknowledge that they were obligated to pay, and would pay, the first dollar of any settlement with Hyde, up to the limits of the Canadian policies, frustrated settlement negotiations and prevented a settlement from being concluded for $3 million or less. When, well into the *Hyde* trial, Key and Schering finally tendered the first $2 mil-

---

**8.** It is unclear exactly how the New York courts would resolve the issue of whether an excess carrier has a cause of action in tort against its insured; they have not yet addressed the issue. However, in light of the fact that we have determined that New Jersey law governs plaintiffs' tort claims, the uncertainty of New York law on this point has no implications for the present case.

lion in order to stave off a disastrous verdict for Hyde, it was too late: Hyde rejected both an offer of $2 million and a subsequent offer of $3 million (the initial $2 million plus the $1 million of Excess's coverage), and now demanded all available insurance coverage.

5. Aside from the bad faith Key and Schering showed in trying to get the excess insurers to assume Canadian's, and then Key's, coverage responsibilities, Key and Schering also (a) failed to properly investigate the merits of Hyde's claims and assess the risks of litigating vis-a-vis the costs of settlement; (b) failed to keep plaintiffs informed about the risks of exposure in the *Hyde* case and the posture of settlement negotiations, and thereby prevented plaintiffs from taking the actions necessary to protect their rights under the Employers policy; and (c) failed to obtain plaintiffs' approval for the ultimate settlement.

Plaintiffs contend that defendants' pattern of bad faith and negligence, as just outlined, constituted breaches of three provisions of the Employers policy:

16. The Assured [Key] shall use due diligence and prudence to settle all claims and suits which in the exercise of sound judgment should be settled, provided, however, that the Assured shall not make or agree to any settlement for any sum in excess of the underlying insurance without the approval of the Company [Employers].

. . . .

19. At no time shall the Company be called upon to assume charge of the investigation, settlement, or defense of any claim made, suit brought or proceeding instituted against the Assured, but the Company shall have the right and shall be given the opportunity to associate with the Assured or its underlying insurer(s) in the investigation, settlement, or defense of any claims, suit or proceeding which appears likely to involve the Company.

. . . .

24. The Company's obligation to pay any ultimate net loss for any accident or occurrence falling within the terms of this policy of insurance shall not attach until the amount of applicable underlying limit has been paid by or on behalf of the Assured or until the Assured's obligation to pay such amounts shall have been finally determined, either by judgment against the Assured after the actual trial or by written agreement of the Assured, the claimant, and the Company.

Defendants, obviously, contest plaintiffs' version of the events relating to the *Hyde* case. In particular, they claim that there never was a possibility of settling the *Hyde* case for less than $5 million prior to the commencement of trial, and that, even if there were such a possibility, defendants acted reasonably in deciding to litigate the case rather than settle it. Defs.' Mem. in Support at 1–2.

We will now proceed to address each of the three policy provisions at issue in plaintiffs' contract claims, and determine whether plaintiffs have raised a genuine issue of material fact as to whether defendants breached them.

### i. *Paragraph 16: "Due Diligence and Prudence"*

■ The essence of plaintiffs' claim under the first part of Paragraph 16 of the Employers policy is that a reasonable and prudent insured, operating under the circumstances in which Key and Schering found themselves, would have timely accepted the offer to settle the *Hyde* case for $3 million. In other words, the "exercise of sound judgment," and the use of "due diligence"[9] and "prudence," ought to have led Key and Schering to recognize that Hyde's offer of a $3 million settlement was a good offer, one that was more than worth the price of foregoing the chance to escape liability entirely by proceeding to trial and winning a defense verdict.

---

**9.** Due diligence is "'[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.'" *People v. Seto*, 616 N.Y.S.2d 890, 894 (N.Y.Sup.Ct.1994) (quoting Black's Law Dictionary 457 (6th ed. 1990)).

However, the basic premise of plaintiffs' argument, which is that there was an offer by Hyde to settle the case for roughly $3 million, has no basis in the summary judgment record. From the very beginning of settlement discussions, all the way through to the onset of the trial, Hyde's counsel made it clear that they were making a "policy limits" demand; that is, a demand that Key surrender all of the insurance available to it, including any and all excess insurance. Hyde's counsel made their policy limits demand in letters to Key and Schering's counsel and MMO's counsel,[10] as well as at the first mediation session held in late December, 1990. Deposition of Daniel F. Sullivan, Attorney for Michael Hyde, October 28, 1992, at 34. Canadian's insolvency did nothing to modify this policy limits demand. When it became clear to all concerned in late December, 1990, that Canadian's financial difficulties would prevent it from tendering the first $2 million of insurance coverage, Hyde's counsel wasted little time in devising a way around the potential impasse: settlement money received from two co-defendant physicians would be applied against, and basically substitute for, Canadian's layer of coverage, while the excess insurers, Excess and Employers, would still be expected to contribute their coverage layers, totalling $3 million, to the settlement. *See* Letter from Daniel F. Sullivan to John G. Bergmann, Attorney for Schering, January 4, 1991, at 3; Letter from Daniel F. Sullivan to Carol L. Moody, Attorney for Canadian on behalf of Schering/Key, January 7, 1991, at 1.[11]

**10.** *See* Letter from Daniel F. Sullivan, Attorney for Michael Hyde, to Carol L. Moody, Attorney for Canadian on behalf of Schering/Key, July 20, 1990, at 1 ("There have been no settlement negotiations in this case. I have, at various times, been informed that Key's policy limits were $5 million, $4 million and $7 million. At any rate, I hereby make an offer to settle Michael Hyde's case as to Key Pharmaceutical for its policy limits, to include any and all excess insurance available.); Letter from Daniel F. Sullivan to Carol L. Moody, August 8, 1990, at 2 ("Any of the attorneys representing Michael [Hyde] ... would be happy to meet with the head people from Key's insurance company and Key in an attempt to resolve the case for policy limits now. However, again, we have to see the policies, to include any excess policies."); Letter from Daniel F. Sullivan to John G. Bergmann, Attorney for Schering, January 4, 1991, at 3 ("We had previously offered to settle with Key for their policy limits, which we understood to be $5 million. It is my understanding of the Employers Mutual policy that Key's limits are actually $4 million.... [W]e'd like to make it clear that we are willing to settle with Key for their total policy limits of $4 million, if that is what their policy limits are."); Letter from Daniel F. Sullivan to Carol L. Moody, January 7, 1991, at 1 ("I don't know who is representing the excess carriers, or who has been in contact with them.... However ... please notify those excess carriers that we are willing to settle for policy limits...."); Letter from Daniel F. Sullivan to Carol L. Moody and John G. Bergmann, January 28, 1991, at 1 ("All claimants would agree to settle all causes of action against Key Pharmaceutical and their successor corporations by way of the payment of the balance of insurance coverage remaining, which we understand to be $3 million (assuming Canadian Universal Insurance Company Limited, which held the first $2 million worth of coverage is insolvent)...."); Letter from Daniel F. Sullivan to William O'Brien, Attorney for MMO, January 13, 1991, at 1, 2 ("In order to get this case resolved, all the lawyers representing [Michael Hyde] ... have recommended that an offer be made to settle the case with [Key and Schering] for the total amount of policy limits.... I think you have a duty to ... make an offer to settle for all available insurance policy proceeds, to include your $2 million and whatever other coverage is available."); Letter from Paul N. Luvera, Attorney for Michael Hyde, to Defense Counsel for Key Pharmaceutical, March 5, 1991.

**11.** Although plaintiffs strain to read these two January, 1991 settlement letters from Hyde counsel Daniel Sullivan as containing offers to settle the case for a total of $3 million, regardless of the source of the $3 million, their reading is flatly contradicted by the contemporaneous correspondence. *See* Letter from Daniel F. Sullivan to William J. O'Brien, Attorney for MMO, January 13, 1991, at 1–2; Letter of William J. O'Brien to Steven Niehaus, Attorney for Excess, February 1, 1991, at 1 ("[T]he only demand [for settlement] previously communicated to us was a demand for policy limits '... of all insurers of Key Pharmaceutical.' [Sullivan letter of January 13, 1991.]"). Moreover, plaintiffs cannot rely on a letter written by Sullivan on the eve of trial as evidence that Hyde eventually backed away from his limits demand. *See* Letter from Daniel F. Sullivan to Carol L. Moody and John G. Bergmann, January 29, 1991. Whatever settlement offer Sullivan was trying to communicate in that highly ambiguous letter, one thing is clear: it was not an offer for a "firm" $3 million. The language of that letter on its face does not support such an interpretation; and the language as explained by the deposition testimonies of Joel Cunningham, the attorney for one of the co-defendant doctors, and Sullivan positively precludes such an interpretation. *See* Deposition of Joel Cunningham, November 5, 1992, at 39–40;

Of course, an argument can be made that Hyde's counsel *would have* modified their policy limits demand if only Key and Schering had engaged them and sought to negotiate the settlement price downward. *See* Pls.' Mem. in Support at 24–25, 54. But there is no evidence in the record suggesting that Hyde's counsel would at any point have responded to an offer of $2 million from Key and Schering by modifying their policy limits demand. On the contrary, the record strongly suggests that the policy limits demand was part of a carefully calculated strategy by Hyde's counsel to place Key's insurers—primary and excess alike—in a bad-faith position. As explained by Hyde counsel Daniel Sullivan:

A. It's a regular—part of the practice is to make demands for policy limits.... The idea is that we make sure that we do make an offer for policy limits so whatever verdict we get is collectible, in other words, what we call the doctrine of bad faith here.

Q. Can you explain that a little bit more, please?

A. If we make an offer to settle for policy limits and we have a case where the damages are high and rather easy to determine in the sense of what a jury would give and what a court would uphold, and that offer is rejected, then if we do go ahead and get a verdict in excess of the policy limits, then the insurance company who refused to settle for within the policy limits is liable for the payment of the whole judgment, even if their insured, who might only have had a million or two million or five million, whatever, has no assets.... [O]ne of the reasons [for making a policy limits demand] is to have the insurance companies either accept or reject. If they reject, then we felt that ultimately whatever verdict we'd get would be payable by the insurance company.

Deposition of Daniel F. Sullivan, October 28, 1992, at 16, 19.

Plaintiffs do not dispute that Hyde's counsel were sophisticated and well-versed in the dynamics of pharmaceutical products liability cases; nor do they offer evidence that rebuts

the strong impression in the record that Hyde's counsel were bent on pursuing a strategy designed to protect what they believed would be a plaintiff's verdict and award of damages in the amount of $10 million or more. *See, e.g.,* Letter from Daniel F. Sullivan to Carol L. Moody, July 18, 1990, at 1–2; Letter from Daniel F. Sullivan to Carol L. Moody, August 7, 1990, at 1–2; Letter from Daniel F. Sullivan to Carol L. Moody, January 7, 1991, at 2; Letter from Daniel F. Sullivan to William J. O'Brien, Attorney for MMO, January 13, 1991, at 1–4. Indeed, MMO attorney William O'Brien complained in a letter to Schering that

the plaintiff's willingness to accept $2.9 million, if that is the limit of insurance, or $6.5 million, if that is the limit of insurance, simply indicates a lack of good faith on the plaintiff's part in approaching settlement negotiations. This is a frivolous attempt to place Key's insurer's in a 'bad faith' position.

Letter from William J. O'Brien to John G. Bergmann, January 18, 1991, at 1. While such explicit calculation on the part of Hyde's counsel may have been subject to question insofar as Hyde's interests were concerned, it was certainly a legitimate litigation tactic open to Hyde.

Above all, such calculation by Hyde's counsel demonstrates that the basic premise of plaintiffs' contract claim relating to the first part of Paragraph 16 is flawed, and that summary judgment for defendants on this claim is appropriate. Judge Lumbard remarked in *Young v. American Casualty Co. of Reading, PA,* 416 F.2d 906, 911 (2d Cir. 1969), *cert. dismissed,* 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1970), that

[i]t is a matter of common knowledge that it is a rare case where exploration of the possibilities of settlement, beyond the mere receipt of the plaintiff's demand, will not result in some substantial reduction of the amount.

This observation is undoubtedly sound, especially in the context of the garden variety slip-and-fall case that was before the *Young* court. However, the circumstances of this

Deposition of Daniel F. Sullivan, October 28, 1992, at 63–65.

case and the strategies testified to by Hyde's counsel negate the suggestion that more diligent settlement efforts by defendants would have resulted in a settlement which did not require contribution from plaintiffs. Long before defendants ever began inquiring as to whether Employers would "drop down" and finance Canadian's layer of coverage in the event that Canadian could not, Hyde's counsel was demanding policy limits. That demand never changed.[12]

We would add only the following. Even if we were to assume, *arguendo*, that there was at some point a possibility of settling the *Hyde* case for $3 million, we are not convinced that plaintiffs have raised a genuine issue of material fact as to whether defendants acted imprudently or unreasonably in rejecting it. To begin with, plaintiffs do not deny that Carol Moody, the Washington attorney retained by Canadian to defend the *Hyde* lawsuit on behalf of Key and Schering, evaluated the suit as having a settlement value of $1–2 million, *assuming 100% liability*. Carol L. Moody, Attorney's Suit Status Report, December 20, 1990, at 1. Nor do plaintiffs challenge the reasonableness of defendants' position (maintained consistently throughout the course of the *Hyde* litigation) that the *Hyde* case was in large part a "medical malpractice" case (that is, that Michael Hyde's treating physicians were negligent in the way they administered Key's theophylline product);[13] or that the most that either of the treating physicians had to pay in settlement of Hyde's claims was $850,-000. Plaintiffs also do not deny that, at the first mediation session held in December, 1990, the mediator suggested to Carol Moody that the *Hyde* case could be settled for roughly $1.5 million. *See* Letter from William J. O'Brien to Carol L. Moody, December 29, 1990, at 1–2; Deposition of William J. O'Brien, June 8, 1993, at 181–82. Finally, plaintiffs do not deny that, for a number of reasons, the facts of the *Hyde* case were less compelling, from a plaintiff's standpoint, than the facts of the *Fisons* case, and, consequently, less likely to result in a multi-million dollar verdict for the plaintiff. *See* Letter from William J. O'Brien to Karen Harding, Attorney for MMO, January 23, 1991, at 4–5.

Together, these uncontested facts strongly suggest that Key and Schering's settlement offer of roughly $850,000 on the eve of trial was not the product of an imprudent or

12. *Compare United States Fidelity & Guar. Co. v. Copfer*, 48 N.Y.2d 871, 424 N.Y.S.2d 356, 400 N.E.2d 298 (1979) (speculation that insurer might have been able to settle within policy limits is insufficient to support claim for excess damages) *with Young v. American Casualty Co. of Reading, PA*, 416 F.2d 906 (2d Cir.1969) (applying New York law) (affirming verdict against primary carrier for bad faith refusal to settle where evidence indicated that had defendant carrier responded to plaintiff's demand for $40,000, a settlement within the $20,000 policy limit might have been reached); *see also Rova Farms Resort, Inc. v. Investors Insur. Co. of America*, 65 N.J. 474, 323 A.2d 495, 505 (1974) ("Even those cases in other jurisdictions which have found in favor of the insurance company on the basis that no settlement demand was made by the injured party, generally suggest that the evidence did not indicate that such settlement could have been effected in any event.").

13. *See* In-house Memorandum from William R. Hedden, Jr., Attorney for Schering, November 2, 1988 ("[T]he theophylline problem appears to have resulted from poor medical care and improper dosing."); Letter from James Dundon to Carol L. Moody, August 21, 1989, at 2 ("Hopefully, these [medical] experts will also be willing to testify that the problem was simply a result of

overdosing the child."); Carol L. Moody, Attorney's Suit Status Report, December 20, 1990, at 2 ("[T]here is a strong argument that the physicians were administering unnecessary, high doses of Theo–Dur and were not monitoring the plaintiff's theophylline blood level in an appropriate manner."); Memorandum from James Dundon to Schering Distribution, January 21, 1991, at 3 ("[W]e continue to view this as primarily a case of medical malpractice on the part of the codefendant and former codefendant physician.... The thrust of our settlement talks with plaintiff will be that, on the basis of comparative liability, Key should pay considerably less than the $850,000 paid by the primary physicians."); Memorandum from James Dundon to Schering Distribution, February 27, 1991, at 1 ("The question of proximate causation is still an open one in that we and our experts feel that Dr. Anderson was clearly guilty of medical malpractice which was the actual cause of Michael Hyde's seizures and brain damage."); *see also* Letter from William J. O'Brien to Karen Harding, Attorney for MMO, January 23, 1991, at 5 ("The facts indicate that a jury should assign a great deal of responsibility [for Michael Hyde's injuries] to Dr. Anderson for failing to monitor his patients [sic] theophylline levels and failing to appreciate the warning signs of theophylline toxicity.").

unreasonable course of conduct, but rather an offer that was informed by a defensible rationale. And that fact, in turn, provides an alternate ground on which we hold that defendants are entitled to summary judgment on plaintiffs' claim that they breached that part of Paragraph 16 of the Employers policy requiring defendants to "use due diligence and prudence to settle all claims and suits which in the exercise of sound judgment should be settled." [14]

### ii. *Paragraph 19: "Duty to Keep Informed"*

■ Plaintiffs next claim that defendants breached Paragraph 19 of the Employers policy because, by failing to keep Employers and MMO informed about the progress of the *Hyde* case and the risks of exposure that it entailed, they effectively denied plaintiffs their right to an opportunity "to associate with the Assured or its underlying insurer(s) in the investigation, settlement or defense of any claim, suit or proceeding which appears likely to involve the Company." Excess Liabilities Umbrella Policy for Employers Mutual Casualty Company, ¶ 19; *see* Pls.' Motion in Support at 56–57.

However, this claim wrongly assumes that defendants were always functioning as the primary-carrier-in-fact in the *Hyde* litigation. The truth is that the alleged lack of cooperation about which plaintiffs complain occurred at a time when Canadian was still solvent and orchestrating the defense and settlement posture of Key and Schering. For example, plaintiffs claim that, despite requests made by MMO in 1987 and again in 1989 to be kept informed about the progress of the *Hyde* case, it wasn't until August 30, 1990 that plaintiffs received notification that their layer of coverage was likely to be involved. Pls.' Mem. in Support at 56. But, as the contemporaneous correspondence reveals, Key and Schering were not controlling the defense of the *Hyde* case during this time period; Canadian was.[15] Any failure to keep plaintiffs sufficiently informed must therefore be laid,

**14.** We reach this conclusion despite indications in the record that Schering officials believed the *Hyde* case had *the potential* of ending in a multimillion dollar verdict exceeding all of Key's insurance coverage. *See, e.g.,* Letter from James Dundon to Morgan M.W. Weber, Senior Litigation Counsel for Schering, September 20, 1989, at 1; Letter from Morgan M.W. Weber to Jean–Pierre Garnier, Attorney for Schering, August 27, 1990, at 1; Letter from James Dundon to Schering Distribution, January 21, 1991, at 2. As Schering attorney Morgan Weber noted at his deposition, there are some cases that can be settled for a certain sum of money, even though the liability does not warrant such a settlement, *and* even though there is a prospect for a substantially larger award. Deposition of Morgan M.W. Weber, May 5, 1993, at 58. Certainly MMO attorney William O'Brien recognized that *Hyde* might be one such case. On January 23, 1991, at the same time he was insisting to defendants that *Hyde* could and should be settled for $3 million or less, O'Brien was advising MMO in the following manner:

> Although we could expect a settlement within the underlying policy limits [*i.e.,* $3 million] if Key accepts its responsibility to act in lieu of Canadian, the case appears headed for trial on Monday morning. This raises the possibility of jury verdicts in excess of the underlying limits. While we do not expect the verdicts would exceed $5 million, the stated damages to Hyde are in excess of $13 million and it would be prudent to so advise any insurers above your layer.

Letter from William J. O'Brien to Karen Harding, January 23, 1991, at 6.

**15.** *See* Letter from William R. Hedden, Jr. to Carol L. Moody, July 21, 1986, at 1 (requesting that Moody's firm keep Schering fully informed of developments in the *Hyde* litigation); Letter from Jean–Pierre Garnier, Attorney for Schering, to James Dundon, October 11, 1989, at 2 ("I am sure you realize that Carol Moody will remain primarily responsible for [the *Hyde* case] and that my participation will be as an observer and as one who can put pressure on the insurance carrier [Canadian] to do things as we want them done."); *id.* at 3 ("[S]ince the insurance carrier [Canadian] has insisted on selecting counsel [Moody], if Schering is truly concerned about the level of representation, it might advise the carrier of the fact that Schering will seek indemnification of any damages that may be accessed against Schering above and beyond the amount of coverage available."); Letter from Jean–Pierre Garnier to James Dundon, October 20, 1989, at 1 ("It was agreed with Morgan [Weber] that we [Schering] would not undertake any conversations or conferences at this time with the carrier [Canadian] for the purpose of determining whether it has any intentions of settling these cases, and, if so, for what amount, nor to undertake any activity to try and put any pressure on the carrier to settle … *Hyde* … within the amount of the policy limits available to the Company [Key]."); Letter from Morgan M.W. Weber to James Dundon, December 18, 1990 (expressing desire to further discuss possibility of placing a demand letter "on the insurance carriers").

if at all, at Canadian's door, not Key and Schering's. The same can be said regarding plaintiffs' complaint that Carol Moody, the attorney hand-picked by Canadian to defend the *Hyde* case, waited too long to prepare an evaluation of the merits of the case. *See* Deposition of William J. O'Brien, June 8, 1993, at 76, 79.

To be sure, there did come a point—sometime in January, 1991—when, owing to Canadian's financial incapacity, defendants assumed control of the defense in the *Hyde* litigation. But plaintiffs have presented no evidence that, after assuming control of the defense, defendants failed to keep plaintiffs informed of developments in the case. Their claim that defendants withheld from them the mediator's suggestion that the *Hyde* case could be settled for $1.5 million is flatly contradicted by the deposition testimony of their own attorney, William O'Brien. *See* Deposition of William J. O'Brien, June 8, 1993, at 180–83. In fact, the only impediment to plaintiffs' "taking ... actions ... to protect their rights under the policy of insurance," Pls.' Mem. in Support at 24, seems to have come from O'Brien himself, who, in light of the need to study the issues raised by Canadian's insolvency, decided not to exercise the authority granted him by MMO in early December, 1991, to conduct his own evaluation of Hyde's claims. *See* Deposition of William J. O'Brien, June 8, 1993, at 138–141.[16]

For all of the foregoing reasons, the Court grants defendants' motion for summary judgment as it relates to plaintiffs' claim under Paragraph 19 of the Employers policy.

### iii. *Paragraph 24: When Employers' Obligation Attaches*

■ Plaintiffs next claim that defendants breached Paragraph 24 of the Employers policy by insisting that Employers might have to "drop down" and fund Canadian's underlying layer of coverage after Canadian became insolvent. *See* Pls.' Mem. in Support at 24, 49–50. In plaintiffs' view, Paragraph 24 makes clear that Employer's obligation to tender its layer of coverage attaches only upon the occurrence of certain carefully defined events, and that the insolvency of the primary carrier is *not* one of those events.

There is no doubt that, in the several months leading up to the *Hyde* trial, defendants made inquiries into whether Employers would "drop down" and cover the gap in coverage left by Canadian's insolvency, and that they refused to acknowledge that there was no "drop down" obligation when requested to do so by plaintiffs. *See* Letter from William J. O'Brien to Carol L. Moody, December 29, 1990, at 2; Letter from John G. Bergmann to William J. O'Brien, January 15, 1991. It is also clear that plaintiffs' argument from the language of Paragraph 24 has merit. In 1992, the New York Court of Appeals held that policy language that was more ambiguous than the language of Paragraph 24 did not require an insured's second excess carrier to "drop down" and fill in for the first excess carrier, which had become insolvent. *See Ambassador Assocs. v. Corcoran,* 79 N.Y.2d 871, 581 N.Y.S.2d 276, 589 N.E.2d 1258 (1992) (4–3 decision), *aff'g mem.* 168 A.D.2d 281, 562 N.Y.S.2d 507 (1st Dept. 1990), *aff'g* 143 Misc.2d 706, 541 N.Y.S.2d 715 (Sup.Ct.N.Y.Cty.1989).

In this case, of course, there is no issue of "drop down" *per se* which must be resolved, since Key, the insured, ultimately filled the gap in its coverage *itself* when it and Schering tendered the first $2 million in settlement to Hyde in March, 1991. What remains to be resolved, and what we understand plaintiffs to be emphasizing, is the question of whether defendants exhibited bad faith when they insisted that Employers might have to "drop down" and fund Canadian's layer of coverage in spite of the policy language contained in Paragraph 24.

■ Plaintiffs are correct in noting that every contract has an implied covenant of good faith and fair dealing. *Gordon v. Nationwide Mut. Ins. Co.,* 30 N.Y.2d 427, 334

---

**16.** O'Brien testified at his deposition that the issues surrounding Canadian's insolvency prevented Carol Moody from communicating with him about the *Hyde* case, providing him with information, working on a claims evaluation, etc. Deposition of William J. O'Brien, June 8, 1993, at 138. But O'Brien did not think that it was unreasonable of Carol Moody to switch her attention at the time to the issues raised by Canadian's insolvency. *Id.* at 140.

N.Y.S.2d 601, 608, 285 N.E.2d 849, 854 (1972) (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933)), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). Under New York law, this implied covenant requires insurance companies to negotiate settlements in good faith and to give the interests of their insureds "at least equal consideration in evaluating the propriety of a settlement." *Brown v. United States Fidelity & Guaranty Co.*, 314 F.2d 675, 678 (2d Cir.1963); *see also Young*, 416 F.2d at 910.

Moreover, we shall assume, for the sake of argument only, that this duty to give the insured's interests equal consideration applies just as fully to policyholders that step into the shoes of their primary carriers as it does to the carriers themselves, and, further, that defendants acted in bad faith when they insisted on exploring the issue of plaintiffs' obligation to "drop down."

■ Nonetheless, an insurer is liable for the amount of a settlement in excess of its coverage responsibilities only if the insured or excess carrier can show that, as a result of the insurer's bad faith, an actual opportunity to settle within its coverage limits was lost. *United States Fidelity & Guar. Co. v. Copfer*, 48 N.Y.2d 871, 424 N.Y.S.2d 356, 400 N.E.2d 298, 298–99 (1979). No "actual opportunity to settle" is deemed to have existed if the insurer can show, by some affirmative evidence, that there was no realistic possibility of settlement within its policy limits, and, further, that the insured would not have contributed to whatever settlement figure could have been obtained. *Young*, 416 F.2d at 911; *see also Rova*, 323 A.2d at 507 (citing *Young*).

For the reasons given *supra* Part II(C)(i), we believe that the summary judgment record contains affirmative evidence showing that there never was a realistic possibility of settling the *Hyde* case within Key's (self-insured) coverage limit of $2 million, or even for $3 million or $4 million, prior to the

actual settlement. There are positive, and unrebutted, indications in the record that, had they sought to do so, defendants would not have succeeded in negotiating the settlement price downward from Hyde's policy limits demand.[17] Because an essential element of plaintiffs' "bad faith" claim is without foundation in the record, we grant defendants' motion for summary judgment as to plaintiffs' claim under Paragraph 24 of the Employers policy.

iv. *Paragraph 16: "Approval of the Company"*

■ Plaintiffs' final claim under the Employers policy is that defendants breached the second part of Paragraph 16 by failing to seek or obtain plaintiffs' approval of the ultimate settlement concluded with Hyde. Defendants respond that, prior to the settlement, plaintiffs had disclaimed their contractual obligations under the Employers insurance contract, thus waiving their right of approval under Paragraph 16.

In the 1992 opinion, we found that although plaintiffs disclaimed responsibility for the *Hyde* claims prior to the effectuation of the settlement, they believed that defendants' breach of the Employers contract had relieved them of their own contractual obligations. *Employers Mutual Casualty Co., et al.*, 1992 WL 8712, at *11. Because material facts concerning this alleged breach by defendants remained in dispute, we declined at that time to grant defendants' motion for summary judgment on this issue.

Since the issuance of the 1992 opinion, discovery in this case has been completed. At this stage of the litigation, we can say two things. First, it is now clear to us that plaintiffs' disclaimer of their obligations under the Employers contract was total and unqualified. MMO attorney William O'Brien advised Key and Schering on March 6, 1991, that their mishandling of the *Hyde* litigation "has terminated any obligation Employers may have had to Key.... [Y]ou have no choice but to act as a prudent unin-

---

**17.** This means that there is affirmative evidence in the record showing that, prior to the actual settlement, there was not an opportunity to settle *Hyde* for some amount above the maximum limits of defendants' exposure but below the maxi-

mum limits of plaintiffs' exposure. Thus, the question as to whether plaintiffs would have been willing to contribute, say, $500,000 of their $2 million layer, as opposed to $1.175 million, is not a viable one.

sured...." Letter from William J. O'Brien to Jean–Pierre Garnier, Attorney for Schering, March 6, 1991, at 2, 3. On its face, this language amounts to a repudiation by plaintiffs of the Employers contract; and nothing that the parties have produced in discovery qualifies that repudiation in any way.

Second, plaintiffs' repudiation of the Employers' policy is clearly inconsistent with their position that defendants ought to have acted as if the policy continued in effect and consulted plaintiffs on settlement. There is no doubt but that, in advising defendants to proceed as a "prudent uninsured," plaintiffs waived their rights under the Employers contract to be consulted as to the terms of the *Hyde* settlement. Accordingly, we grant defendants' motion for summary judgment on plaintiffs' claim under the second half of Paragraph 16.

### D. *Defendants' Counterclaim*

Defendants have brought a counterclaim in this action, alleging that plaintiffs themselves breached the terms of the Employers policy by disclaiming coverage groundlessly. This counterclaim is essentially the converse of plaintiffs' claim that they should be excused from having to indemnify defendants for their losses (in excess of $2 million) in the *Hyde* litigation. Given that, for all of the foregoing reasons, we are granting defendants' motion for summary judgment on plaintiffs' petition for relief from contribution, we grant defendants' counterclaim for nonpayment by plaintiffs of their share of the losses covered by the Employers policy.

### III. Attorney's Fees

■ Defendants assert that they are entitled to an award of attorney's fees, and rely on *Mighty Midgets, Inc. v. Centennial Insurance Co.*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (N.Y.1979), to that effect. *Mighty Midgets* does indeed state that an award of fees against an insurer is available when the insured is "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligation." 389 N.E.2d at 1085. However, the *Mighty Midgets* principle does not apply to situations like this one where the insurer seeks to be relieved only from its obligations to indemnify, as opposed to its obligations to defend. *Puritan Insurance Co. v. Eagle Steamship Co., S.A.*, 779 F.2d 866, 872–73 (2d Cir.1985). And because we do not perceive that the circumstances of this case furnish a basis for an award of fees under either Federal Rule of Civil Procedure 11 or the Court's equity powers, defendants' request for fees is denied.

### IV. Conclusion

We are mindful of the caution with which the question of summary judgment must be addressed in cases where the parties' state of mind is relevant. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). But although caution must be exercised, it is clear that summary judgment is an available remedy even when intent is in issue. *See McLee v. Chrysler Corp.*, 38 F.3d 67 (2d Cir.1994). In a case such as this one, where exhaustive discovery has fully illuminated the facts upon which inferences of intent and good faith are to be drawn and where, especially, the Court will itself be the ultimate fact finder in the event summary judgment is denied, summary judgment is surely not precluded and, indeed, appears here to be entirely appropriate.

Defendants' motion for summary judgment as to each of plaintiffs' causes of actions is granted, as is defendants' motion for summary judgment on its counterclaim.

SUBMIT ORDER.