75 F.3d 815
 64 USLW 2544
 EMPLOYERS MUTUAL CASUALTY CO.; and Mutual Marine Office,
Inc., As Attorney In Fact For Employers Mutual
Casualty Company,
Plaintiffs-Appellants-Cross-Appellees,
v.
KEY PHARMACEUTICALS; and Schering-Plough Corp.,
Defendants-Appellees-Cross-Appellants.
 Nos. 232, 738, Dockets 95-7139, 95-7177.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 27, 1995.
Decided Feb. 5, 1996.
 
 Robert J. Giuffra, Thomas Giuffra, New York City (James E. Ryan, Dougherty, Ryan, Giuffra & Zambito, New York City, of counsel), for Plaintiffs-Appellants-Cross-Appellees.
 Avraham C. Moskowitz and John Doyle, New York City (Chaim B. Book, Anderson Kill Olick & Oshinsky, P.C., New York, NY, of counsel), for Defendants-Appellees-Cross-Appellants.
 Before: ALTIMARI and JACOBS, Circuit Judges, and CONNER, District Judge.*
 PER CURIAM:
 
 
 1
 Second-layer excess liability insurers appeal from a judgment of the United States District Court for the Southern District of New York (Sand, J.), entered in favor of their policyholder (and its parent company) on claims and cross-claims arising from the settlement during a trial of an underlying products liability action. The second-layer excess insurers alleged that the policyholder and its parent breached duties in tort and contract when they failed to settle the products liability case prior to trial for an amount that would not have invaded the second excess layer of coverage. Following the settlement, the second-layer excess insurers refused to pay and commenced this declaratory judgment action. The policyholder, Key Pharmaceuticals, Inc. ("Key" or the "Policyholder"), and its parent company counterclaimed to recover the portion of the settlement that invaded the second excess layer of coverage. The district court granted summary judgment in favor of the policyholder, but denied attorney's fees and a post-judgment motion for pre-judgment interest. Plaintiffs appeal, and defendants cross-appeal.
 
 
 2
 We affirm the judgment of the district court in all respects, and we do so on the grounds and for the reasons set forth in the district court's opinion, published at 871 F.Supp. 657 (S.D.N.Y.1994). We write in order to address the challenges to that opinion interposed on appeal. Familiarity with the district court opinion is assumed, but we summarize the facts and holdings of the district court's opinion in order to provide the essential context for our discussion of those challenges.
 
 BACKGROUND
 
 3
 In 1985, Michael Hyde sued Key in Washington state court, alleging that he suffered permanent brain damage after taking Theo-Dur, an asthma drug manufactured by Key. In 1986, Schering-Plough Corporation ("Schering") purchased Key, and in 1988 Hyde amended his complaint to add Schering as a defendant under the doctrine of successor liability. Hyde ultimately settled for $4.175 million on March 7, 1991, in the midst of trial.
 
 
 4
 Hyde's claim arose during the policy period October 27, 1979 through October 27, 1980, during which period Key was insured for product liability by (i) Canadian Universal Insurance Co. ("Canadian"), which provided the first $2 million in primary and umbrella coverage; (ii) Excess Insurance Co. ("Excess"), which provided first-layer excess coverage of $1 million excess of Canadian's $2 million coverage; and (iii) Employers Mutual Casualty Company, which provided second-layer excess coverage of $2 million excess of the $3 million from Canadian and Excess. The Employers policy was issued to Key by Mutual Marine Office, Inc. ("MMO"), as managing agent and attorney-in-fact for a pool of insurance companies that included Employers. Employers Mutual Casualty and MMO (collectively, "Employers") are the plaintiffs in this action.
 
 
 5
 Key notified its insurers of the Hyde action, and Canadian agreed to undertake Key's defense, retaining Carol Moody as lead counsel. In July 1990, Daniel Sullivan, one of Hyde's attorneys, initiated settlement negotiations and "offer[ed] to settle" for Key's "policy limits, to include any and all excess insurance available." Letter from Daniel F. Sullivan to Carol L. Moody (July 18, 1990).
 
 
 6
 Although Canadian continued to provide and control Key's defense of the Hyde action until January 1991, Canadian was under increasing financial strain. It became evident by autumn 1990 that Canadian was nearing insolvency and that Key and Schering could not look to the Canadian policy for the first $2 million of coverage. Key and Schering assumed a more active role in directing counsel Moody (and paying her bills) and in the settlement negotiations. Essentially, Key had become self-insured for the first $2 million of the risk.
 
 
 7
 In the months leading up to trial, and during it, Key and Schering received news of enormous jury verdicts rendered in various claims involving the same drug. In one case, Pollock v. Fisons, the manufacturer settled with the plaintiff for $6.9 million, and the plaintiff's attorneys in that case subsequently became co-counsel for Hyde. Schering Memorandum from James A. Dundon, Senior Litigation Counsel, to Richard Wilson, Manager of Insurance and Loss Prevention (Aug. 23, 1990). In another case, the Batteast case, the co-defendant treating physicians turned on the manufacturer, and the jury returned a $23 million award. Schering Memorandum from James A. Dundon to Morgan M.W. Weber (September 20, 1990) (discussing Fisons and Batteast ). See also Schering Memorandum from James A. Dundon to "Distribution" (Jan. 21, 1991) (mentioning unspecified "recent settlements or verdicts of $10.2, $24 and $77.8 million dollars in theophylline cases"). Key and Schering, along with their insurers and lawyers, grew increasingly anxious about the exposure in the Hyde case. The trial of Hyde's claim began on January 31, 1991. On the eve of trial, Key and Schering offered a structured settlement with a present value of $825,000 to $850,000, which was rejected. In March, five weeks into the trial, Hyde rejected two escalating settlement offers of $2 million and $3 million.
 
 
 8
 The settlement strategy adopted by Hyde's lawyers was to offer to settle for full policy limits at every layer. Their goal was to put the insurers in a squeeze, because an insurer's refusal to settle for policy limits (and protect its insured from unlimited exposure) may be deemed an act of bad faith that would make the insurer potentially liable for any judgment in excess of policy limits.
 
 
 9
 As this pressure was applied, Employers agitated in favor of more generous settlement offers within the policy limits underlying Employers' coverage. William J. O'Brien, counsel for MMO, informed Moody that Employers would not "drop down" from its third layer of coverage in order to pay any part of the $2 million primary and umbrella exposure left by Canadian. Letter from William J. O'Brien to Carol Lee Moody (December 29, 1990). Meanwhile, two co-defendant doctors settled with Hyde for $1.05 million. Sullivan offered to "credit" the amount of the doctors' settlement towards Key's liability (on the theory that Key and the doctors were jointly and severally liable) with the hope that Key could use that settlement to reduce its uninsured primary and umbrella exposure. Letter from Daniel F. Sullivan to John G. Bergmann (Jan. 4, 1991); letter from Daniel F. Sullivan to Carol Moody (Jan. 7, 1991). O'Brien, counsel for MMO, wrote to Schering, referencing Sullivan's offer, rejecting Sullivan's theory of "credit" for the first layer, and reiterating that Employers would not "drop down," as Employers saw it. Letter from William J. O'Brien to Richard E. Wilson (Jan. 11, 1991). O'Brien also informed Sullivan of MMO's position. Letter from William J. O'Brien to Daniel F. Sullivan (Jan. 11, 1991).
 
 
 10
 With trial approaching, Employers remained firm in the position that (1) Key must assume responsibility for the primary and umbrella exposure left uninsured by Canadian's insolvency, and (2) the case could and should settle within the $3 million limits underlying the Employers policy. Letter from William J. O'Brien to John G. Bergmann (Jan. 18, 1991); letter from William J. O'Brien to Karen Harding, MMO (Jan. 23, 1991). Relations between Employers and the by-then self-insured Key deteriorated over time, and were ruptured on March 6, 1991, when MMO's lawyer advised Key and Schering in writing that their mishandling of the Hyde claim "terminated any obligation Employers may have had to Key.... [Y]ou have no choice but to act as a prudent uninsured...." Letter from William J. O'Brien to Jean-Pierre Garnier (Mar. 6, 1991).
 
 
 11
 The next day, Key and Schering settled the Hyde case for $4.175 million. Key paid the first $2 million, and Excess tendered its $1 million layer of excess coverage, but Employers refused payment of the remaining $1.175 million and commenced this declaratory judgment action.
 
 DISCUSSION
 
 12
 In four causes of action against Key and Schering, Employers alleged that Key (1) negligently and in bad faith breached its duties to Employers in its virtual role as the primary insurer after Canadian's insolvency; (2) negligently and in bad faith breached the duties owed to Employers following Key's assumption of responsibility for the Hyde litigation and settlement negotiations; (3) breached the Employers insurance contract, such as by failing to use "due diligence and prudence" to settle; and (4) breached its duties to Employers by adopting a "drop down" theory that hampered settlement efforts. In sum, Employers charged that Key had failed to seek or seize opportunities to settle the Hyde litigation at a level that would preserve Employers' policy limits intact.
 
 
 13
 The district court granted summary judgment in favor of Key and Schering on all four of Employers' claims and on Key and Schering's counterclaim for nonpayment under the Employers policy. The court began its analysis by holding that the law of New Jersey (Schering's place of incorporation and the principal place of business for Key and Schering) governed the tort claims, and that the law of New York governed the contract claim. Neither side disputes these choices of law.
 
 
 14
 A. Tort Claims.
 
 
 15
 The district court dismissed all three of Employers' tort claims on a single ground. Although New Jersey recognizes that a primary insurer owes a duty of care to an excess carrier to conduct the defense and to settle claims with due regard for the excess layer of coverage, the court concluded that New Jersey would not recognize a similar duty running to the excess carrier from a policyholder self-insured at the primary level. While New Jersey courts have not yet ruled on that issue, the district court discerned that the duty running from a primary carrier to an excess carrier exists in part "to reinforce the fiduciary duty already running from [the] primary carrier to [the] insured." 871 F.Supp. at 665. When the primary insurer drops out of the picture, this duty disappears. Moreover, the district court recognized that accepting Employers' tort claims "would substantially increase the duty and potential liability of the insured," id., and it could not "responsibly predict that New Jersey would impose a new burden, through a new duty of care, on a policyholder." Id.
 
 
 16
 Finally, the district court observed that policyholders pay premiums to insulate themselves from the risks of litigation, including the risks inherent to settlement negotiations:
 
 
 17
 We have found no basis in the law ... for concluding that, apart from the premiums it pays, an insured also assumes a fiduciary duty of care toward its insurer in the context of settlements. Indeed, we have no idea what the basis for a fiduciary duty running from insured to insurer would be, independent of the terms of the contract of insurance itself.
 
 
 18
 Id. at 666. Since all of Employers' tort claims rested on the theory that a policyholder owes common-law duties to the excess insurer, the district court granted summary judgment in favor of Key. Id.
 
 
 19
 In its brief, Employers contends that the district court incorrectly dismissed its tort claims, because "the language of [Key and Schering's] insurance policy established a cause of action sounding in tort, for negligently failing to settle the Hyde case." Employers claims that the "due diligence and prudence" language of paragraph 16 of the policy "specifically protected [the] negligence causes of action."
 
 
 20
 Employers does not dispute the district court's holding that there is no tort cause of action under New Jersey law. It claims only that paragraph 16 of the policy imposed on Key a duty of care to Employers that was breached by the failure to settle for $3 million. To the extent that Employers actually challenges the district court's construing of paragraph 16, we discuss that contract claim more fully below.
 
 
 21
 B. Contract Claims.
 
 
 22
 Employers essentially alleged that Key and Schering had neglected opportunities to settle the Hyde litigation for $3 million (an amount which would have required no contribution at the second excess layer), and that this failure to settle breached three sections of the policy. The district court addressed four specific contract arguments (two based on the same provision).
 
 
 23
 1. Due Diligence in Settlement.
 
 
 24
 First, the court discussed paragraph 16 of the policy, which provides:
 
 
 25
 The Assured shall use due diligence and prudence to settle all claims and suits which in the exercise of sound judgment should be settled, provided, however, that the Assured shall not make or agree to any settlement for any sum in excess of the underlying insurance without the approval of the Company.
 
 
 26
 The district court held that Key did not breach its duty to use due diligence and prudence in settling the Hyde case: "[T]he basic premise of [Employers'] argument, which is that there was an offer by Hyde to settle the case for roughly $3 million, has no basis in the summary judgment record." 871 F.Supp. at 668. Rather, the district court found that Hyde's attorneys consistently demanded a settlement in the amount of Key's policy limits.
 
 
 27
 Furthermore, the district court stated that, "[e]ven if we were to assume ... that there was ... a possibility of settling the Hyde case for $3 million, we are not convinced that [Employers has] raised a genuine issue of material fact as to whether [Key and Schering] acted imprudently or unreasonably in rejecting it." Id. at 670. It was undisputed that defense counsel Moody and a mediator had both concluded that a reasonable settlement would be much less than $3 million. In addition, Key and Schering viewed the Hyde action mainly as a medical malpractice case against the two doctors, and considered it less compelling than a recent similar case that had resulted in a multi-million dollar plaintiff's verdict. Employers did not dispute that this was a reasonable perspective on Key's liability. The district court concluded: "Together, these uncontested facts strongly suggest that Key and Schering's [settlement negotiation] was not the product of an imprudent or unreasonable course of conduct, but rather ... was informed by a defensible rationale." Id. at 670-71. This constituted an alternative ground for summary judgment with respect to Employers' first contract argument.
 
 
 28
 Employers argues on appeal that the district court erred in finding that there was no evidence in the record that Key and Schering had received an offer to settle the Hyde case for $3 million. Employers claims that the record conclusively supports the contrary finding, or, alternatively, that a material fact remains with respect to that issue.
 
 
 29
 Having reviewed the numerous exhibits referenced by Employers, we are convinced that the district court correctly assessed the summary judgment record. Employers cites various letters from Sullivan (Hyde's counsel) to defense personnel. However, these letters, when read in their entirety, clearly evince the intent to settle for the limits of all of Key's policies, including the limits covered by Employers.
 
 
 30
 In his January 4, 1991, letter to John Bergmann, an outside attorney for Schering, Sullivan wrote:
 
 
 31
 We had previously offered to settle with Key for their policy limits, which we understood to be $5 million. It is my understanding of the Employer Mutual policy that Key's limits are actually $4 million.... [W]e'd like to make it clear that we are willing to settle with Key for their policy limits of $4 million, if that is what their policy limits are.
 
 
 32
 (emphasis added). Sullivan went on to say he knew that Canadian was close to insolvency, and that he made a settlement offer that he hoped might limit Key's resulting exposure on the first $2 million in liability.
 
 
 33
 As this is a case of joint and several liability and we are offering to settle with Key and Schering ... for their total policy limits of $4 million[,] in view of the recent settlements with the [co-defendant] doctors worked out at the mediation, this would mean you would have a credit of $1,050,000.00 on your insurance policy limits, which would in turn mean that we would expect payment from Midland of $950,000 and payment from Employers Mutual Casualty Company of $2 million for a total payment of $2,950,000.00.
 
 
 34
 Thus, Employers' claim that Sullivan "was willing to settle Hyde for $2,950,000.00" grossly mischaracterizes the January 4, 1991, letter, in which Sullivan explicitly repeated his demand for Key's "total policy limits." The $2.95 million figure merely represents the subtraction of a $1.05 million "credit" (the settlement with the co-defendant doctors) from the $4 million "total policy limits," as Sullivan mistakenly understood them to be. Evidently, Sullivan introduced the idea of the "credit" in an attempt to induce Key to settle, when it might otherwise balk at swallowing the $2 million initial layer exposed by Canadian's insolvency.
 
 
 35
 Sullivan reiterated this offer in his January 7, 1991, letter to Moody: "[W]e are willing to settle for policy limits as outlined in my letter to [Bergmann], $950,000 from Midland and $2 million from Employers Mutual, with a credit to Canadian Universal of $1,000,000 and a credit to Midland of $50,000.00." (emphasis added) He further communicated with O'Brien, counsel for MMO, in a January 13, 1991 letter, stating, "[We] have recommended that an offer be made to settle the case with [the defendants] for the total amount of policy limits." (emphasis added) In the same letter, Sullivan wrote:
 
 
 36
 It may well be ... that all of Key Pharmaceutical's .. insurance coverage, except yours, is uncollectible for one reason or another. If that is true, then I think you have a duty to so inform us and make an offer to settle for all available insurance policy proceeds, to include your $2 million and whatever other coverage is available.
 
 
 37
 Employers treats as smoking guns various letters by Sullivan and Moody, plus internal defense memoranda. In his January 29, 1991, letter to Moody and Bergmann, Sullivan closed with the following:
 
 
 38
 At any rate, our offer, or some form of our offer, remains open until tomorrow morning, the bottom line being that at least $3 million be made available or guaranteed in some satisfactory fashion to resolve the plaintiffs and Dr. Anderson's claims.
 
 
 39
 In her January 29, 1991, letter to O'Brien and Steve Niehaus of Westco Claims Management, Moody said that "plaintiff ... is standing by his $3 million demand which was previously communicated to you." Two Schering memoranda dated January 31, 1991 contain the statements: "Plaintiff continues to remain steadfast in the 3 million dollar settlement demand," and "[p]laintiff's settlement demand has been a firm 3 million." Schering Memorandum from James A. Dundon to R. Baldini and R. Bryce (Jan. 31, 1991); telefax from Morgan M.W. Weber of Schering, to James A. Dundon (Jan. 31, 1991).
 
 
 40
 Employers, however, omits a reference to a January 28, 1991, letter from Hyde's lawyers (including Sullivan) to Moody and Bergmann, which made the following offer:
 
 
 41
 All claimants would agree to settle all causes of action against [the defendants] by way of the payment of the balance of insurance coverage remaining, which we understand to be $3 million....
 
 
 42
 (emphasis added) Hyde's counsel further said that "[t]his offer will remain open until Wednesday morning [January 30, 1991]." It is obvious that Hyde's lawyers were referring to the January 28 offer in their January 29 letter: "Our previous offer remains open until such time as Judge Schapira announces her decision as to the stay order, Wednesday, January 30, 1991 at which time it will be withdrawn." The January 28 letter also explains Sullivan's "bottom line" demand for "at least $3 million," and the use of the $3 million figure in the correspondence by Moody and within the Schering memoranda of January 29 and 31.
 
 
 43
 In sum, Employers' assertion that "the [district] court almost totally ignored the numerous specific references in the record to a $3 million settlement demand contained in correspondence" is untenable. The court below was completely correct in its conclusion that Hyde had never offered a $3 million settlement that would have avoided exposure to the second excess layer. For that reason, Employers' claim under paragraph 16 of the policy fails. Alternatively, we reject Employers' claim that the district court misread the record in finding that the settlement negotiations were conducted in a prudent and reasonable manner.
 
 
 44
 2. Duty to Associate.
 
 
 45
 The second argument advanced by Employers on appeal is based on paragraph 19:
 
 
 46
 At no time shall the Company be called upon to assume charge of the investigation, settlement, or defense of any claim made, suit brought or proceeding instituted against the Assured, but the Company shall have the right and shall be given the opportunity to associate with the Assured or its underlying insurer(s) in the investigation, settlement or defense of any claim, suit or proceeding which appears likely to involve the Company. In the event that the Company avails itself of such right or opportunity, the Assured, the Company and the underlying insurer(s) shall cooperate in the investigation, settlement or defense of such claim, suit or proceeding. Failure on the part of the Assured to cooperate shall relieve the Company, if it so chooses, of any liability under this policy.
 
 
 47
 Employers alleged that it was denied the opportunity to "associate with the Assured ... in the investigation, settlement or defense" of the Hyde litigation, because Key breached its duty to keep Employers informed about the progress of the case. The district court concluded that this contract argument rests on the erroneous premise that Key functioned throughout as the primary carrier. However, "the alleged lack of cooperation ... occurred at a time when Canadian was still solvent and orchestrating the defense and settlement posture of Key and Schering.... Any failure to keep [Employers] sufficiently informed must therefore be laid, if at all, at Canadian's door, not Key and Schering's." 871 F.Supp. at 671-72. Moreover, with respect to the period after Key took control of the litigation, Employers "presented no evidence that ... [Key and Schering] failed to keep [Employers] informed of developments in the case." Id. at 672. Thus, there was no record support for finding that Key and Schering had breached paragraph 19.
 
 
 48
 On appeal, Employers contends that the district court erred in concluding that Key did not breach paragraph 19. It argues that Canadian was not a party to the policy and so owed no duty to Employers, and that in any case Key had taken an active role early in the defense.
 
 
 49
 Contrary to this characterization, paragraph 19 does not impose on Key a general duty to inform Employers. It provides that "the Company shall have the right and shall be given the opportunity to associate with the Assured or its underlying insurer(s) in the investigation, settlement or defense of any claim, suit or proceeding which appears likely to involve the Company." Employers claims that paragraph 19 was breached by Key's failure to inform Employers about mediation in the Hyde case and Key's failure to forward status reports for 1987 and 1989.
 
 
 50
 Employers cites nothing in the record to support its assertion that it requested, but never received, 1987 and 1989 status reports. Employers also claims that Key failed to give notice until August 30, 1990 that the excess layer of coverage would be involved. However, there is in the record a November 20, 1989, letter from MMO to American Universal Insurance Group, Inc., referencing Key as the insured, Hyde as claimant, and "Theodur" as the product. In that letter, MMO said that the case did "not appear to warrant involvement on the part of excess underwriters" but requested continuing updates, particularly if Key "may be exposed beyond primary limits." Although O'Brien, counsel to MMO, did express surprise when Moody informed him of ongoing mediation in December 1990, he conceded that Moody was very busy with the case at that time, and he accepted her apologies for not returning phone calls. Deposition of William J. O'Brien at 175-76. Moreover, O'Brien admitted that he had elected not to participate in mediation so as not to give Hyde's counsel the idea that Employers seriously anticipated paying a claim. Id. at 134.
 
 
 51
 Most important, Employers fails to explain what damage was caused by any of Key's alleged failures to inform, other than the supposedly lost opportunity for a settlement within the limits of the underlying coverage. We conclude that the district court correctly held that Key and Schering did not breach paragraph 19.
 
 
 52
 3. Bad Faith.
 
 
 53
 The third contract argument rests on paragraph 24 of the policy:
 
 
 54
 The Company's obligation to pay any ultimate net loss for any accident or occurrence falling within the terms of this policy of insurance shall not attach until the amount of applicable underlying limit has been paid by or on behalf of the Assured or until the Assured's obligation to pay such amounts shall have been finally determined, either by judgment against the Assured after the actual trial or by written agreement of the Assured, the claimant, and the Company.
 
 
 55
 Employers claimed that Key breached paragraph 24 by insisting in bad faith that Employers should "drop down" and fund the initial layer of coverage exposed by Canadian's insolvency. The district court reasoned that, even if a self-insured policyholder had the same duty as an insurance company to negotiate settlements in good faith, an insurer under New York law is liable for the amount of a settlement in excess of its coverage only if the policyholder or excess insurer can show that the bad faith prejudiced an actual opportunity to settle within the coverage limits of the insurer in control of the claim. 871 F.Supp. at 673. Since, as the district court had already found, the record showed no actual opportunity to settle the Hyde case for $3 million, there was no breach of duty.
 
 
 56
 On appeal, Employers claims the district court erred in concluding that Key and Schering "would not have succeeded in negotiating the settlement price downward from Hyde's policy limits demand," id., because there was evidence that Key and Schering had insurance policies with limits of more $25 million, and Hyde's attorneys never sought anything close to that amount. Employers also pursues its contention that Hyde had made an offer to settle for $3 million.
 
 
 57
 For the reasons discussed above, we agree with the district court that there was no genuine offer to settle for $3 million. As for the contention that Hyde's attorneys were not interested in policy limits because they never demanded $25 million, that argument references coverage for which Schering (the parent company), not Key (the product manufacturer), was the policyholder. Schering's coverage stood on a completely different footing, because it could not be triggered without a finding that Schering was liable under a theory of successor liability. In any case, there is no indication in the record that Hyde's counsel set sights on Schering's coverages.
 
 
 58
 4. Settlement Approval.
 
 
 59
 Employers' final contract argument, also based on paragraph 16, alleged that Key and Schering had failed to seek or obtain Employers' approval of the ultimate settlement with Hyde. The district court found this claim to be meritless, because Employers had repudiated the policy on March 6, 1991, the day before the settlement, id. at 673-74, and that repudiation relieved Key of the obligation to seek Employers' approval before settling. Id. at 674. We agree with the district court's reasoning.
 
 
 60
 C. Counterclaims.
 
 
 61
 Having found that Key and Schering were entitled to summary judgment on Employers' claims, the district court granted Key and Schering summary judgment on their counterclaim for payment under the policy. But the court denied Key and Schering's request for attorney's fees. In a later decision published at 886 F.Supp. 360 (S.D.N.Y.1995), the district court partially granted Key and Schering's motion under Rule 60 seeking pre-judgment interest, awarding interest only for the period between the decision and the judgment; the court denied pre-decision interest.
 
 
 62
 1. Attorney's Fees.
 
 
 63
 In their cross-appeal, Key and Schering argue that the district court erred in construing New York law to deny attorney's fees. They rely on Mighty Midgets, Inc. v. Centennial Ins. Co., 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979), in which the Court of Appeals of New York held that a policyholder may recover attorney's fees, "when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations." 47 N.Y.2d at 21, 416 N.Y.S.2d at 564, 389 N.E.2d at 1085 (citation omitted). This, however, is an exception to the general rule, also articulated in Mighty Midgets, that a prevailing party cannot recover the costs of litigation. 47 N.Y.2d at 21-22, 416 N.Y.S.2d at 564, 389 N.E.2d at 1084.
 
 
 64
 Under New York law, it is "well settled that an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk." Sukup v. State, 19 N.Y.2d 519, 522, 281 N.Y.S.2d 28, 31, 227 N.E.2d 842, 844 (1967) (citations omitted). In Aetna Casualty & Surety Co. v. Dawson, 84 A.D.2d 708, 444 N.Y.S.2d 10 (1st Dep't 1981), aff'd, 56 N.Y.2d 1022, 453 N.Y.S.2d 683, 439 N.E.2d 398 (1982), the court resolved the apparent tension between Mighty Midgets and Sukup and denied attorney's fees to the policyholder. Although the Dawson court found that the policyholder in fact was not put in a defensive posture, the court also said that a "second, but more fundamental, reason" to deny attorney's fees was that the insurer's duty to defend was not at issue. Dawson, 84 A.D.2d at 709, 444 N.Y.S.2d at 12. Mighty Midgets does no more than carve out a narrow exception to the general rule that litigation costs are not recoverable by a winning litigant; that exception arises when a policyholder has been cast in a defensive posture by its insurer in a dispute over the insurer's duty to defend. Id. See also Puritan Ins. Co. v. Eagle Steamship Co. S.A., 779 F.2d 866, 872-73 (2d Cir.1985); New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, --- N.Y.S.2d ----, --- N.E.2d ---- (1995) (punitive damages will not be awarded for breach of contract, unless necessary to deter gross conduct). Since the duty to defend is not at issue in this case, we conclude that under New York law, attorney's fees cannot be awarded.
 
 
 65
 2. Pre-Decision Interest.
 
 
 66
 Key and Schering argue on appeal that the district court erred in partially denying their motion for prejudgment interest under Federal Rule of Civil Procedure 60(b)(1), which states: "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect." A denial of a motion under Rule 60(b) is reviewed for abuse of discretion. Paddington Partners v. Bouchard, 34 F.3d 1132, 1140 (2d Cir.1994). A movant under Rule 60(b) must demonstrate "exceptional circumstances" justifying the extraordinary relief requested. Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir.1986).
 
 
 67
 It is undisputed that Key and Schering never demanded pre-judgment interest in their pleadings or motion papers during the proceedings below. After winning summary judgment, they submitted a proposed order and judgment that did not grant pre-judgment interest as part of the relief. It was not until after both sides filed appeals to this Court that this claim surfaced. We conclude that the district court did not abuse its discretion in partially denying pre-judgment interest under Rule 60(b)(1). Neither side disputes the district court's grant of post-decision interest in response to the Rule 60(a) motion.
 
 
 68
 We reject Key and Schering's claim that the district court denied their motion out of a mistaken belief that the court lacked authority to grant it. The first stated reason for denying the motion is that, after considering Key and Schering's explanation for the failure to request the interest, the district court simply did not find it credible. 886 F.Supp. at 362. Key and Schering claimed that they had a "failure to focus" on their entitlement to pre-judgment interest under New York law, because they were preoccupied with hotly disputed choice-of-law issues: Employers was urging the application of New York contract law, while Key and Schering claimed Florida law applied. The district court expressed puzzlement at this rationale, because Florida law also provides an entitlement to pre-judgment interest. Id. The court clearly made a deliberate determination that the relief sought was not warranted, and we cannot say that this was an abuse of discretion.
 
 CONCLUSION
 
 69
 For the reasons set forth above, we affirm the judgment of the district court.
 
 
 
 *
 William C. Conner, United States District Judge for the Southern District of New York, sitting by designation